IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

Criminal No.:  ELH-17-322

PERRY BROWN

Defendant.

**MEMORANDUM OPINION**

Perry Brown, defendant, entered a plea of guilty in February 2018 to charges of conspiracy to distribute narcotics and conspiracy to commit money laundering.  ECF 130.  In December 2018, defendant was sentenced to eighty months' imprisonment (ECF 296), which he is currently serving at FCI Allenwood Low.  ECF 326; ECF 387 at 2; ECF 432.

While self-represented, Brown filed a motion for compassionate release.  ECF 326.  The government submitted an opposition.  ECF 353.  Then, through counsel, Brown filed a supplemental memorandum in support of the motion.  ECF 387.  Counsel subsequently submitted two additional supplements (ECF 389, ECF 390), as well as an exhibit containing Brown's medical record.  ECF 392.  I shall refer to ECF 326, ECF 387, ECF 389, and ECF 390 collectively as the "Motion."  The government has not responded to defendant's supplemental submissions.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the Motion.

**I.  Background**

Defendant and one other person were indicted on June 14, 2017.  ECF 13.  A Superseding Indictment was filed on September 6, 2017 (ECF 21), naming eleven defendants.  In a Superseding Information filed on February 20, 2018 (ECF 125), Brown was charged with conspiracy to

distribute and possess with intent to distribute a mixture or substance containing a detectable amount of heroin and fentanyl, in violation of 21 U.S.C. § 846 (Count One), and with conspiracy to commit money laundering, in violation of 18 U.S.C. § 371 (Count Two).

Brown entered a plea of guilty to both counts on February 21, 2018 (ECF 129), pursuant to a Plea Agreement. ECF 130. The Plea Agreement contemplated a base offense level of 38, based on the quantity of drugs involved in the offense, and before reductions for defendant's acceptance of responsibility for his criminal conduct. *Id.* ¶ 6. There was no agreement as to defendant's criminal history. *Id.* ¶ 7.

The Plea Agreement included a stipulation of facts. *Id.* at 9-11. According to the stipulation, during 2016 and 2017 law enforcement conducted a wiretap investigation into a drug-trafficking conspiracy in the Baltimore area and elsewhere. *Id*. at 9. Brown was a participant in the conspiracy, engaging in drug deals and in phone conversations in which he planned drug transactions with fellow conspirators. *Id*. at 9-10. On multiple occasions, Brown, a drug user, travelled to Mexico, where the narcotics suppliers were located, to test narcotics prior to purchase. *Id*. at 9. Investigators knew Brown travelled to Mexico based on immigration travel records, border surveillance, and intercepted conversations. *Id*.

In April and June 2017, investigators executed search warrants on storage units used by Brown. *Id*. On the first occasion, investigators found two kilogram-sized objects that were wrapped and appeared to contain narcotics. *Id*. On the second, investigators found approximately four kilograms of heroin. *Id*. In addition, investigators obtained a search warrant for Brown's residence in Pikesville, Maryland, finding, among other items, 9.81 grams of fentanyl, a 9mm handgun, $6,000 in U.S. currency, drug packaging material, and suspected cutting material. ECF 130 at 10.

2

Investigators observed Brown meeting with "CC1" on May 31, 2017, in Jessup, Maryland. *Id*. After the meeting, Brown went to a nearby parking lot and engaged with two men with a tractor trailer, from whom he received two duffel bags. *Id*. Maryland Transportation Authority Police, working with the DEA, conducted a traffic stop of Brown. *Id*. A trained police canine alerted to the presence of narcotics. *Id*. Officers searched Brown's vehicle, located the duffel bags, searched them, and recovered 31 kilograms of fentanyl and ten kilograms of heroin. *Id*. Defendant has been in custody since that date. ECF 296 at 2.

Brown stipulated that he possessed the heroin and fentanyl in furtherance of the conspiracy to distribute the narcotics. ECF 130 at 10. Brown also admitted that he had participated in the payments of money to the conspiracy's suppliers, in exchange for narcotics sold to the organization. *Id*. at 10-11.

Sentencing was held on December 11, 2018. ECF 294. At that time, Brown was fifty-four years old. *See* ECF 151 (Presentence Report or "PSR") at 3. The PSR reflected that defendant had two prior Maryland convictions, each of which was assigned one point. *Id*. ¶¶ 39-43. In particular, in 2009 defendant was convicted of possession of cocaine and sentenced to one year of supervised probation. *Id*. ¶ 40. And in 2014, Brown was convicted of possession of cocaine and sentenced to six months' incarceration, followed by one year of supervised probation. *Id*. ¶ 41. All but two days of the six-month sentence were suspended. *Id*. In addition, the PSR recounted defendant's extensive history of substance abuse, dating to age 16, including cocaine, heroin, and marijuana. *Id*. ¶¶ 64-65.

As noted, I imposed a total sentence of eighty months' imprisonment. ECF 296. And, I recommended defendant's participation in the Residential Drug Abuse Program at the Bureau of

Prisons ("BOP").  *Id*. at 2.  There is no indication that defendant has committed any disciplinary infractions while incarcerated.

As indicated in Brown's second supplemental memorandum, he contracted COVID-19 in January 2021, while at FCI Allenwood Low.  ECF 390; *see also* ECF 392 at 30 (Brown's medical records, indicating a positive COVID-19 PCR test administered on January 11).  Brown's medical records also indicate that on January 6, 2021, he was offered, but declined, an opportunity to receive the Moderna COVID-19 vaccine.  ECF 392 at 27, 46.

Including credit for the roughly 18 months that defendant spent in pretrial detention, *see* ECF 353-5 at 3, Brown has currently served about 52 months of his 80-month sentence, or approximately 65%.  The submissions indicate that Brown has a projected release date of February 3, 2022, accounting for good time.  ECF 326; ECF 353 at 14; ECF 353-5.

Brown became eligible for home detention on August 3, 2021.  But, counsel for defendant informed the Court that defendant remained confined at FCI Allenwood Low as of August 16, 2021, due to issues relating to two Maryland criminal charges, one from 1992 and one from 2005, both of which were placed on the stet docket.  ECF 432.  Counsel for the defendant has indicated that, upon release, Brown plans to move to Maysville, North Carolina, to live with his cousin.  ECF 387 at 11-12.

The government has conceded that Brown "has exhausted the administrative requirements associated with a First Step Act sentencing reduction request."  ECF 353 at 3.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395

(4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf

or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility,"

whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may

petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after

considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds

that

> (i) extraordinary and compelling reasons warrant such a reduction;

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the

defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction

of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3)

the sentence modification is "consistent" with applicable policy statements issued by the

Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and

compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  But, in

U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A)

Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling

reasons" that might warrant compassionate release.  *See McCoy*, 981 F.3d at 276. The Sentencing

Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C).  *McCoy*, 981 F.3d at

276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last

updated in November 2018, prior to the enactment of the First Step Act in December 2018.  *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)    **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> (I)  suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III)  experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence.  Application Note 1(C) concerns Family Circumstances.  Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205.  However, the Court may not rely on the Program Statement.  Rather, the Court must consider the Sentencing Commission's policy statements.  *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").  However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act.  Thus, it is only "directed at BOP requests for sentence reductions."  *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  In other words, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-

filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, 992 F.3d 326, 329-30 (4th Cir. 2021) (per curiam) (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). But, compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020

WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.  COVID-19[1]

Since early 2020, the nation has been "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[2]  The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as

---

[1] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[2] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis.

The virus is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. Many people who are stricken with the virus experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Although this country saw a reduction of cases in prior months, the spread of the Delta variant has, in more recent weeks, reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html. (noting that, as of August 14, "[i]nfections have spiked to the highest levels in six months"). And, the Delta variant is thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants").

As of September 14, 2021, COVID-19 has infected roughly 41.3 million Americans and caused approximately 663,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Sept. 14, 2021).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart

11

disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, July 17, 2020, and November 2, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. On May 13, 2021, to reflect the most recently available data, the CDC again revised its guidance.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 13, 2021), https://bit.ly/38S4NfY.   According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; and substance use disorders.  *Id.*  The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  Social distancing is particularly difficult in the penal setting, however.  *Seth*, 461 F. Supp. 3d at 248; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June

2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from

approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 461 F. Supp. 3d at 248. Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

The Department of Justice ("DOJ") recognized the unique risks posed to inmates and employees of the BOP from COVID-19. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend

the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since expanded considerably, and the vaccine is now available to all persons twelve years of age and older.  Approximately 63% of the eligible population, and 65% of all persons eighteen years of age and older, are fully vaccinated. *See See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Sept. 14, 2021).  And, 54% of the total U.S. population is fully vaccinated. *See id.*

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4.  Its initial plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-

prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  As of September

14, 2021, the BOP had 131,028 federal inmates and 36,000 staff.  And, by that date, the BOP had

administered 221,134 vaccine doses to staff and inmates.  *See* https://www.bop.gov/coronavirus/

(last accessed Sept. 14, 2021).[3]

As of September 14, 2021, BOP reported that 474 inmates out of a total of 131,028 inmates,

and 553 BOP staff out of some 36,000 staff members, currently test positive for COVID-19;

42,997 inmates and 7,423 staff have recovered from the virus; and 253 inmates and six staff

members have died from the virus.  Moreover, the BOP has completed 121,085 COVID-19 tests.

*See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Allenwood Low, where the defendant is imprisoned, the BOP reported

that as of September 14, 2021, no inmates or staff have tested positive.  But, 234 inmates and 21

staff have recovered at the facility.  In addition, 427 staff members and 1,710 inmates at the

Allenwood    complex    have    been    inoculated    with    the    vaccine.          *See*

---

[3] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in
recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases
Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020),
https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October
29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000
people have been infected and at least 1,450 inmates and correctional officers have died" from
COVID-19.).  On November 21, 2020, the *New York Times* reported that "U.S. correctional
facilities are experiencing record spikes in coronavirus infections this fall. During the week of
Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison
systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020),
https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

More recently, on April 16, 2021, the *New York Times* reported that at least 39% of
prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated
and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021).
And, according to the article, the actual count is most likely much higher "because of the dearth
of testing." *Id.*  Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

https://www.bop.gov/coronavirus/, *supra*; *FCI Allenwood Low*, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/alf/ (last visited Aug. 17, 2021).

## IV. Discussion

Brown has moved for compassionate release on the ground that he suffers from hypertension, and that this underlying medical condition renders him particularly vulnerable to COVID-19.  ECF 387 at 1-2, 4-8.

The government concedes that Brown is eligible for compassionate release on the basis of his hypertension.  ECF 353 at 6-10.  However, it argues that since this hypertension is "well controlled," "there is no substantive reason to believe that the defendant is facing a significant increased risk to his health in light of the COVID-19 pandemic."  *Id*. at 16.

Numerous courts have found that hypertension is an appropriate basis to grant compassionate release.  *See, e.g., United States v. Council*, No. 4:18-CR-00219, 2020 WL 5215142, at *2 (M.D. Pa. Sept. 1, 2020) (hypertension and stage two chronic kidney disease); *United States v. Fletcher*, Crim. No. TDC-05-0179-01, 2020 WL 3972142, at *3-4 (D. Md. July 13, 2020) (Type 2 diabetes and hypertension); *United States v. White*, 13-cr-20653-1, 2020 WL 2557077, at *5 (E.D. Mich. May 20, 2020) (hypertension and obesity); *United States v. Sawicz*, 453 F. Supp. 3d 601, 605-06 (E.D.N.Y. 2020) (hypertension).  But, according to the medical records submitted by Brown, he was given the opportunity to receive the COVID-19 vaccine on January 6, 2021, and declined.  *See* ECF 392 at 27 (BOP Health Services Immunizations record as of January 14, 2021, reflecting that Brown "[r]efused" a COVID-19 vaccine on January 6), 46 (BOP "COVID-19 Vaccine Consent Form – Inmate" dated January 6, 2021 and signed by Brown, in which Brown checked the box marked "I decline to receive the COVID-19 vaccination").

The briefing in this case almost entirely predates Brown's decision not to be vaccinated. Therefore, the parties do not address the issue of Brown's unwillingness to undergo vaccination, or the reasons for his decision.  The Court does not know, for example, if there is a medical reason for Brown's decision.

Nevertheless, Brown's decision to refuse the vaccine substantially weakens his argument for compassionate release.  The CDC has emphasized that "COVID-19 vaccines are effective at helping protect against severe disease and death from variants of the virus that causes COVID-19 currently circulating, including the Delta variant," and that "[w]idespread vaccination is a critical tool to help stop the pandemic." *Key Things to Know about COVID-19 Vaccines*,  Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (updated Aug. 16, 2021).

Given this context, I join a large number of district court judges across the country, including in the District of Maryland, in reasoning that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the claim that his susceptibility to the effects of COVID-19 constitutes grounds for compassionate release.  As Judge Gallagher has observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release. . . .  Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months." *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see United States v. Dempsey*, 1:19-cr-368 (TNM), 2021 WL 2073350, at *3–4 (D.D.C. May 24, 2021) (reasoning similarly); *United States v. Smith*, SAG-20-47, 2021

WL 1733457, at *2 (D. Md. May 3, 2021); *accord United States v. Simpson*, SAG-16-0398, 2021
WL 2260379, at *2 (D. Md. June 3, 2021); *United States v. Cain*, 1:16-CR-00103-JAW, 2021 WL
2269974, at *7 (D. Me. June 3, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713,
at *3 (D. Md. May 13, 2021); *United States v. Ortiz*, 5:18-CR-00264, 2021 WL 1422816, at *4
(E.D. Pa. Apr. 15, 2021); *United States v. Piles*, CR 19-292-5 (JDB), 2021 WL 1198019, at *3
(D.D.C. Mar. 30, 2021) (collecting cases); *United States v. Siegel*, TDC-03-0393, 2021 WL
962491, at *2 (D. Md. Mar. 15, 2021); *United States v. Reynoso*, ___ F. Supp. 3d ___, CR 17-
10350-NMG, 2021 WL 950081, at *2 (D. Mass. Mar. 12, 2021).

The case of *United States v. Spriggs*, CCB-10-364, 2021 WL 1856667 (D. Md. May 10,
2021), does not lead me to a different conclusion.  *Spriggs* concerned a distinct but related set of
circumstances — namely, a movant who *was* vaccinated but nevertheless claimed that his
vulnerability to COVID-19 due to health conditions constituted extraordinary and compelling
circumstances.  There, Judge Blake concluded that "the fact that [the defendant] received a vaccine
does not negate that his underlying health conditions make him eligible for compassionate
release," and that concluding otherwise "would ignore the remaining unknowns about the
protection the vaccine can provide and would create a perverse incentive for prisoners like Spriggs
who seek compassionate release on the basis of medical conditions to decline the vaccine for fear
it would preclude relief."  *Id.* at *3.

In light of Brown's decision to decline the COVID-19 vaccine, I conclude that his medical
condition does not constitute extraordinary and compelling circumstances under 18 U.S.C. § 3582.

However, I also recognize that the vaccine issue has not been briefed; that Brown has not
had the opportunity to provide an explanation for his decision to decline the vaccine; and that
considerable time has passed since January 6, 2021, when Brown declined to receive the vaccine.

Therefore, my ruling is without prejudice to Brown's right to seek reconsideration, addressing, *inter alia*, the Court's concerns, such as a change in vaccination status.

### V.  Conclusion

For the reasons set forth above, I shall deny the Motion (ECF 326), without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date: September 15, 2021                          _____/s/_____
                                                  Ellen L. Hollander
                                                  United States District Judge